# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 22-0234V
UNPUBLISHED

| | |
|---|---|
| ROBERT THOMSON,<br><br>               Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>               Respondent. | Chief Special Master Corcoran<br><br>Filed: April 3, 2023<br><br>Special Processing Unit (SPU); Decision Awarding Damages; Pain and Suffering; Influenza Vaccine; Shoulder Injury Related to Vaccine Injury (SIRVA) |

*Jimmy Zgheib, Zgheib Sayad, P.C., White Plains, NY,* for Petitioner.

*Steven Santayana, U.S. Department of Justice, Washington, DC,* for Respondent.

**DECISION AWARDING DAMAGES**[1]

On March 2, 2022, Robert Thomson filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that he suffered a shoulder injury related to vaccine administration ("SIRVA") as a result of an influenza ("flu") vaccine he received on October 17, 2019. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

Although Respondent conceded entitlement, the parties could not agree on the damages to be awarded, and therefore the matter was scheduled for a "Motions Day" proceeding. For the reasons discussed below, and after hearing argument from the

---

[1] Because this unpublished Fact Ruling contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Fact Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755.  Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

parties, I find that Petitioner is entitled to compensation in the amount of **$84,003.74**, representing $82,000.00 in actual pain and suffering, plus $2,003.74 in unreimbursed out-of-pocket expenses.

## I.    Relevant Procedural History

On November 14, 2022, Petitioner filed a Motion for Ruling on the Record and Brief in Support of Damages ("Mot."). ECF No. 19. After an expedited schedule due to Petitioner's declining health, Respondent filed his Rule 4(c) Report on January 6, 2023, conceding that Petitioner was entitled to compensation. ECF No. 25. A ruling on entitlement was issued on January 11, 2023. ECF No. 26. The parties then attempted to settle damages. After reaching an impasse, Respondent filed a Memorandum ("Resp.") in response to Petitioner's Brief Regarding Damages on February 8, 2023. ECF No. 29. Petitioner filed a reply memorandum ("Repl.") the same day. ECF No. 30.

I subsequently proposed that the parties be given the opportunity to argue their positions at a hearing, at which time I would decide the disputed damages issues. That hearing was held on March 24, 2023,[3] and the case is now ripe for a determination.

## II.   Relevant Medical History

A complete recitation of the facts can be found in the Petition, the parties' respective pre-hearing filings, and in Respondent's Rule 4(c) Report.

In brief summary, Mr. Thomson received the flu vaccine in his left shoulder on October 17, 2019, at a pharmacy in Woods Cross, Utah. Ex. 2 at 4. He had no prior history of left shoulder pain or dysfunction. Petitioner recalled that he felt pain immediately after his vaccination and had limited mobility by the following day. Ex. 3 at ¶5; Ex. 11 at ¶4.

On November 18, 2019 (32 days after vaccination), Petitioner presented to an orthopedic surgeon, Dr. Tyson, complaining of "persistent pain and weakness" in his left shoulder since his flu vaccination. Ex. 5 at 6. Dr. Tyson found that Petitioner lacked "about 20 degrees" in range of motion in his shoulder and had positive impingement testing. *Id*. A December 3, 2019 MRI revealed tendinosis of the distal tendons with minimal fraying, circumferential tear with degeneration of the labrum, and moderate glenohumeral osteoarthritis. Ex. 6 at 263-64.

---

[3] At the end of the March 24, 2023 hearing, I issued an oral ruling from the bench on damages in this case. That ruling is set forth fully in the transcript from the hearing, which is yet to be filed with the case's docket. The transcript from the hearing is, however, fully incorporated into this Decision.

On December 10, 2019, Petitioner presented to his primary care provider with complaints of difficulty swallowing. Ex. 4 at 19-23. He was subsequently diagnosed with esophageal cancer. *See* Ex. 6.

Petitioner underwent an initial physical therapy evaluation on December 12, 2019, where he rated his left shoulder pain at 10/10. Ex. 7 at 4. He completed four sessions of physical therapy through December 26, 2019. *Id.* at 11. Petitioner retuned to Dr. Tyson on January 8, 2020. Ex. 5 at 6-7. He received a cortisone injection and was advised to continue physical therapy. *Id*.

On February 4, 2020, Petitioner returned to physical therapy for an evaluation of his left shoulder. Ex. 8 at 9. He reported a few days of relief from the injection and current pain of 6/10. *Id*. On exam, he had reduced range of motion, reduced mobility, decreased strength, and decreased motor control. *Id*. at 13. He attended five sessions of therapy through March 12, 2020, when he stopped to focus on his cancer treatment and due to the covid-19 pandemic. *Id.* at 14-15; Ex. 3 at ¶13. At his last session, Petitioner continued to report pain of 6/10. Ex. 8 at 14.

On April 20, 2020 (in the midst of the COVID-19 Pandemic), Petitioner returned to Dr. Tyson. Ex. 5 at 6. He reported short-term relief from the injection and some improvement from physical therapy, but continued dysfunction. *Id.* Dr. Tyson noted that Petitioner wished to proceed with shoulder surgery once he received medical clearance after his upcoming cancer surgery. *Id*. Dr. Tyson recommended a Mumford procedure with possible tenotomy or tenodesis. *Id*.

On April 23, 2020, Petitioner underwent an esophagectomy for his cancer. Ex. 9 at 32-33. Since his surgery, Petitioner's health has steadily declined due to his reduced stomach size, weight loss (85 pounds), and neuropathic abdominal pain. Mot. at 5.

Although Petitioner did not seek additional treatment for his shoulder pain, he stated that he has lived with pain, limitations, and dysfunction continually since. Ex. 11 at ¶10. He describes difficulty with activities of daily living, including severe pain with certain motions. *Id*. Petitioner states he was unable to continue treating his shoulder symptoms due to his esophageal cancer and the sequelae he has suffered from his cancer surgery, and because of the Pandemic. *Id*.

### III. The Parties' Arguments

#### a. Petitioner

Mr. Thomson seeks an award of $112,003.74 as compensation, which represents $110,000.00 in pain and suffering and $2,003.74 in out-of-pocket expenses. Mot. at 17; Resp. at footnote 2. To support his pain and suffering request, Petitioner noted that he sought treatment only 32 days after his vaccination, reported high levels of pain, and consistently treated his injury for seven months. Mot. at 16. Petitioner argues that his injury required surgery, however, Petitioner was unable to have the necessary procedures due to the pandemic and his esophageal cancer and declining health. *Id*.

During the hearing and in his briefs, Petitioner discussed prior SIRVA cases that involved injured claimants with similar fact patterns, and thus argued that an award of $110,000.00 in pain and suffering was reasonable and appropriate given that his circumstances were comparable. Mot. at 15-16; Repl. at 4.

#### b. Respondent

Respondent argues that a pain and suffering award of $40,000.00 is appropriate because of the overall course of Mr. Thomson's SIRVA was "mild and limited." Resp. at 11. Respondent argued that Petitioner's treatment course consisted of only three orthopedist visits, one MRI, one cortisone injection, and nine sessions of physical therapy, and lasted only six months. *Id*. at 6-7. Respondent further argued that the lack of additional treatment undermines Petitioner's claims of ongoing pain, limitations, and dysfunction, and that the fact that surgery was recommended, but not performed, does not warrant additional compensation. *Id*. at 7-8.

Respondent also maintained that Petitioner's cited prior SIRVA cases "involve claimants who sought substantially more treatment than Petitioner." Resp. at 11. Respondent cited three prior SIRVA cases with similar treatment courses to Petitioner's in support of his proposed pain and suffering award. *Id*. at 9-10.

### IV. Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4).

Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment awarding such expenses which (i) resulted from the vaccine-

related injury for which the petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (citing *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with that of my predecessor Chief Special Masters) adjudicating similar claims.[4] *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated that the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. *See Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). The *Graves* decision maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 589-90. Instead,

---

[4] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

*Graves* assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id*. at 593-95. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. While *Graves* does not control the outcome of this case, it provides logical guidance that bears on how pain and suffering is calculated.

## V. Prior SIRVA Compensation Within SPU[5]

### A. Data Regarding Compensation in SPU SIRVA Cases

SIRVA cases have an extensive history of informal resolution within the SPU. As of January 1, 2022, 2,371 SPU SIRVA cases have been resolved since the inception of SPU on July 1, 2014. Compensation was awarded in 2,306 of these cases, with the remaining 65 cases dismissed.

Of the compensated cases, 1,339 SPU SIRVA cases involved a prior ruling that petitioner was entitled to compensation. In only 88 of these cases was the amount of damages determined by a special master in a reasoned decision. As I have previously stated, the written decisions setting forth such determinations, prepared by neutral judicial officers (the special masters themselves), provide the most reliable precedent setting forth what similarly-situated claimants should also receive.[6]

1,223 of this subset of post-entitlement determination, compensation-awarding cases, were the product of informal settlement - cases via proffer and 28 cases via stipulation. Although all proposed amounts denote an agreement reached by the parties, those presented by stipulation derive more from compromise than any formal agreement or acknowledgment by Respondent that the settlement sum itself is a fair measure of damages. Of course, even though *any* such informally-resolved case must still be approved by a special master, these determinations do not provide the same judicial guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of

---

[5] All figures included in this decision are derived from a review of the decisions awarding compensation within the SPU. All decisions reviewed are, or will be, available publicly. All figures and calculations cited are approximate.

[6] *See, e.g., Sakovits v. Sec'y of Health & Hum. Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

awards received overall in comparable cases." *Sakovits,* 2020 WL 3729420, at *4 (emphasis in original).

The remaining 967 compensated SIRVA cases were resolved via stipulated agreement of the parties without a prior ruling on entitlement. These agreements are often described as "litigative risk" settlements, and thus represent a reduced percentage of the compensation which otherwise would be awarded. Due to the complexity of these settlement discussions, many which involve multiple competing factors, these awards do not constitute a reliable gauge of the appropriate amount of compensation to be awarded in other SPU SIRVA cases.

The data for all groups described above reflect the expected differences in outcome, summarized as follows:

|  | **Damages Decisions by Special Master** | **Proffered Damages** | **Stipulated Damages** | **Stipulated[7] Agreement** |
|---|---|---|---|---|
| **Total Cases** | 88 | 1,223 | 28 | 967 |
| **Lowest** | $40,757.91 | $25,000.00 | $45,000.00 | $5,000.00 |
| **1st Quartile** | $70,950.73 | $70,000.00 | $90,000.00 | $42,500.00 |
| **Median** | **$95,974.09** | **$90,000.00** | **$122,886.42** | **$60,390.00** |
| **3rd Quartile** | $125,269.46 | $116,662.57 | $161,001.79 | $88,051.88 |
| **Largest** | $265,034.87 | $1,845,047.00 | $1,500,000.00 | $550,000.00 |

### B.   Pain and Suffering Awards in Reasoned Decisions

In the 88 SPU SIRVA cases which required a reasoned damages decision, compensation for a petitioner's actual or past pain and suffering varied from $40,000.00 to $210,000.00, with $94,000.00 as the median amount. Only five of these cases involved an award for future pain and suffering, with yearly awards ranging from $250.00 to $1,500.00.[8]

In cases with lower awards for past pain and suffering, many petitioners commonly demonstrated only mild to moderate levels of pain throughout their injury course. This lack of significant pain is often evidenced by a delay in seeking treatment – over six

---

[7] Two awards were for an annuity only, the exact amounts which were not determined at the time of judgment.

[8] Additionally, a first-year future pain and suffering award of $10,000.00 was made in one case. *Dhanoa v. Sec'y of Health & Hum. Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018).

months in one case. In cases with more significant initial pain, petitioners experienced this greater pain for three months or less. All petitioners displayed only mild to moderate limitations in range of motion ("ROM"), and MRI imaging showed evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. Many petitioners suffered from unrelated conditions to which a portion of their pain and suffering could be attributed. These SIRVAs usually resolved after one to two cortisone injections and two months or less of physical therapy ("PT"). None required surgery. The duration of the injury ranged from six to 30 months, with most petitioners averaging approximately nine months of pain. Although some petitioners asserted residual pain, the prognosis in these cases was positive. Only one petitioner provided evidence of an ongoing SIRVA, and it was expected to resolve within the subsequent year.

Cases with higher awards for past pain and suffering involved petitioners who suffered more significant levels of pain and SIRVAs of longer duration. Most of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and sought treatment of their SIRVAs more immediately, often within 30 days of vaccination. All experienced moderate to severe limitations in range of motion. MRI imaging showed more significant findings, with the majority showing evidence of partial tearing. Surgery or significant conservative treatment, up to 95 PT sessions over a duration of more than two years and multiple cortisone injections, was required in these cases. In four cases, petitioners provided sufficient evidence of permanent injuries to warrant yearly compensation for future or projected pain and suffering.

## VI.     Appropriate Compensation in this SIRVA Case

### a. Awareness of Suffering

Neither party disputes that that Mr. Thomson had full awareness of his suffering and I find that fact is supported by the record evidence.

### b. Severity and Duration of Pain and Suffering

Mr. Thomson's medical records and affidavits illustrate a mild SIRVA with a fairly conservative course of treatment. In total, he had three orthopedist visits, one MRI, one cortisone injection, and nine sessions of physical therapy. He reported moderate to severe pain of 6/10 to 10/10 during his treatment. That said, Petitioner's orthopedic surgeon recommended surgery as the next step in his treatment – and I give weight to that fact as a factor in the severity of Petitioner's injury.

At the hearing, Respondent's counsel argued that Petitioner's cancer treatment, while not irrelevant to his pain and suffering award, should not be a significant contributing

factor. Rather, a pain and suffering award should be based on the treatment received, without considering any unrelated treatment that may have been undertaken. *See* Resp. at 8. While Respondent is correct that the Vaccine Program generally will not compensate petitioners for treatment that was merely contemplated, it is appropriate to consider concurrent medical conditions that may delay or hinder treatment - or even cause a petitioner to discontinue treatment entirely. Here, Mr. Thomson has established that his cancer surgery, and the subsequent sequela therefrom, impacted his ability to obtain further treatment for his SIRVA.[9] Petitioner initially put his shoulder treatment on hold due to his cancer surgery on April 23, 2020. Ex. 3 at ¶12. He then described how since that surgery, his life has changed due to the ongoing sequela, including significant weight loss, difficulty eating, and severe neuropathic pain, all of which prevent him from seeking additional shoulder treatment, including surgery. Ex. 11 at ¶10.

Both parties cited to prior SIRVA cases that reasonably support of their proposed awards, but the appropriate award in this case is less than what Petitioner demands (although higher than Respondent's). Generally, in a SIRVA case without surgical intervention or extraordinary circumstances, I have awarded less than $100,000 in pain and suffering. The mildness of Petitioner's SIRVA is also highly relevant. And although Petitioner's concurrent cancer treatments may have impacted what SIRVA treatment he adopted, it has not been established that more invasive treatments could *not* be performed, or would not have benefitted him. (I do, however, take into account the impact of Petitioner's cancer on how manageable his SIRVA was, and this factor causes me to increase the sum to be awarded somewhat).

Factually, Respondent's proposed cases - *Merwitz v. HHS,* No. 20-1141V, 2022 WL 17820768 (Fed. Cl. Spec. Mstr. Nov. 14, 2022); *Ramos v. HHS,* No. 18-1005V, 2021 WL 688576 (Fed. Cl. Spec. Mstr. Jan. 4, 2021); *Rayborn v. HHS,* No. 18-0266V, 2020 WL 5522948 (Fed. Cl. Spec. Mstr. August 14, 2020) – more closely mirror Mr. Thomson's treatment course than do Petitioner's cases. However, those cases do not involve petitioners like Mr. Thomson, whose concurrent diagnosis of and treatment for esophageal cancer frustrated his SIRVA treatment and increased his pain and suffering as a result. Without Petitioner's cancer diagnosis, his award would be in closer to the range proposed by Respondent; with it, a higher sum is clearly merited.

Under such circumstances and considering the arguments presented by both parties at the hearing, a review of the cited cases, and based on the record as a whole, I find that **$82,000.00** in compensation for past pain and suffering is reasonable and appropriate in this case.

---

[9] Petitioner also argued that the Pandemic affected his ability to seek treatment. But Petitioner's records show he continued to receive cancer treatment during the height of the pandemic restrictions – and even obtained some shoulder treatment in April 2020. Therefore, the intervention of the Pandemic does not fully explain Petitioner's cessation of SIRVA treatment.

### c. Award for Past Unreimbursed Expenses

The parties have agreed that Petitioner should be awarded $2,003.74 in past unreimbursable expenses. Petitioner is awarded this sum without adjustment.

### Conclusion

In light of all of the above, I award **Petitioner a lump sum payment of $84,003.74, representing $82,000.00 for his actual pain and suffering and $2,003.74 in past unreimbursable expenses, in the form of a check payable to Petitioner, Robert Thomson.** This amount represents compensation for all damages that would be available under Section 15(a) of the Vaccine Act. *Id*.

The Clerk of the Court is directed to enter judgment in accordance with this Decision.[10]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[10] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.